Daniel P. Kappes (CA State Bar No. 303454)
Daniel.Kappes@hklaw.com
**HOLLAND & KNIGHT LLP**
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

Robert S. Hill (CA State Bar No. 276056)
Robert.Hill@hklaw.com
**HOLLAND & KNIGHT LLP**
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201
Telephone: (214) 964-9550

Daniel C. Neustadt (NY State Bar No. 4532958)
*(pro hac vice pending)*
Dan.Neustadt@hklaw.com
**HOLLAND & KNIGHT LLP**
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000

Lauren Caverly Pratt (TN State Bar No. 040362)
*(pro hac vice pending)*
Lauren.Caverly@hklaw.com
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380

*Attorneys for Plaintiff Intterra, LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INTTERRA, LLC,<br><br>        Plaintiff,<br>  v.<br><br>THE ANALYTICAL MOOSE LLC and RACHAEL BRADY,<br><br>        Defendants. | Case No. 2:26-at-00414<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Intterra, LLC ("Intterra" or "Plaintiff"), by and through its attorneys, Holland & Knight LLP, files this Complaint against Defendants The Analytical Moose LLC ("The Analytical Moose") and Rachael Brady ("Ms. Brady") (The Analytical Moose LLC and Ms. Brady, collectively, "Defendants"), alleging as follows:

**NATURE OF THE ACTION**

1. This is an action under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Intterra seeks a declaratory judgment of non-infringement as to the mark WILDFIRE AWARE ("Defendants' Mark") for downloadable software in the nature of a mobile application for providing public information on wildfires. Defendants' Mark is the subject of U.S. Trademark Registration No. 7403027, owned by The Analytical Moose.

2. In particular, Intterra seeks a declaration that its use of the marks AWARE, AWARECA, AWARE INTEL HUB, and AWARE OPS (the "AWARE Marks"), in connection with downloadable computer application software for processing, synthesizing and providing public safety information do not infringe upon Defendants' Mark.

**PARTIES**

3. Plaintiff Intterra is a Nevada limited liability company with a principal place of business at 1606 Headway Circle, Suite 9644, Austin, Texas 78754.

4. Defendant The Analytical Moose is a California limited liability company with a principal place of business at 6633 Mountain Side Drive, Igo, California 96047.

5. Upon information and belief, Defendant Rachael Brady is an individual California resident at the address 6633 Mountain Side Drive, Igo, California 96047, and the sole member and owner of The Analytical Moose.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C §§ 1331 and 1338(a), the Declaratory Judgment Act, 28, U.S.C. §§ 2201-2202, and the Lanham Act, 15 U.S.C. § 1501 *et seq*. An actual and justiciable controversy exists between Intterra and

Defendants as to the alleged claims that Intterra's use of the AWARE Marks infringes Defendants' Mark.

7. This Court has personal jurisdiction over the Defendants, and venue is also proper in this Court under 28 U.S.C. § 1391(b)(1)-(2). Pursuant to L.R. 120(d), this case should be assigned to the Sacramento Division of this Court because the action arises in Shasta County. The Analytical Moose is organized under the laws of California and has a principal place of business in Igo, California. Ms. Brady is domiciled and resides in California. Moreover, Defendants expressed intent to file suit in this Court based on the same set of facts and circumstances that led to the filing of this Complaint. Namely, based on Intterra's use of AWARECA and other AWARE Marks, Defendants threatened to file suit in this Court against Intterra for infringement of Defendants' Mark, and Intterra now files this Complaint seeking a declaratory judgment of noninfringement of Defendants' Mark.

## DIVISIONAL ASSIGNMENT

8. Intterra requests that the Clerk assign this case pursuant to the Court's Assignment Plan (General Order No. 44).

## FACTUAL ALLEGATIONS

**A.    Intterra and Its Software.**

9. In 2010, in a landscape of tech companies centered on "disruption," Intterra was founded to create a platform that connects and serves communities. Since its formation, Intterra has become a leader in the field of software created to support public service agencies on the front lines of response to public safety threats. To fulfill its initial mission of supporting fire service agencies, Intterra originally created its software platform to aggregate and synthesize data from various disciplines of public service agencies, and present curated information in a way that would enable firefighters to make immediate, effective decisions. Over time, Intterra has expanded the nature and functions of its software solutions — from wildfire mapping and resource tracking, to evacuation modeling, EMS support, and community risk assessments — but its core mission to support first responders has never changed.

10. As such, Intterra markets and sells its software exclusively to governmental public safety agencies, including fire, EMS, and law enforcement agencies, at municipal, regional, state, and federal levels. Intterra's software products include the First Responder App, a common operating platform for agency command centers (available on mobile and desktop devices), the Community App for sharing real-time information with the public, and a backend Admin Portal that ensures the continuing operation of its user-facing applications. Though certain components of Intterra's software products may ultimately reach the general consuming public, Intterra's governmental agency customers bear the costs associated with providing such software to their constituents.[1]

11. Intterra's First Responder App and Community App collectively offer a wide variety of features that enable the chief officers and command points of public safety agencies to respond quickly and effectively to incidents. Key functions of Intterra's software include tools to manage geographic information system (GIS) tools, data feeds, and incident response components of Incident Command System frameworks, to develop plans to prepare for potential responses, to track, manage, and visualize airborne intelligence, and to securely share information with the public about incidents and events occurring in their jurisdiction. Today, command centers of fire service, law enforcement, search and rescue, and other public service agencies across the country use Intterra's software to maintain a centralized real-time view of public safety incidents.

12. In mid-to-late 2024, Intterra sought to develop another channel through which its governmental agency customers could securely share real-time information with the public: a mobile application. Created for both iOS and Android platforms, Intterra now sells a mobile application to public safety agencies as a component of its Community App solution. While the mobile application is intended for use by the general public, the key function of the mobile application necessarily depends on integration with the agencies' data sources. Intterra does not, and has no intent to, provide the mobile application to any private consumers independently (that is, without the data provided by the agencies who pay for Intterra's software). As such, the primary

---

[1] Additional information regarding Intterra and its software is available on its website at https://www.intterra.io/solutions. Screenshots of this webpage are attached hereto as **Exhibit A**.

consumer base for Intterra's newly developed mobile application is the same class of consumers for all of Intterra's software; namely, governmental agencies.

13. Because government agencies cannot generally purchase any goods or services without following the appropriate procurement processes, the business-to-government (B2G) trade channels through which Intterra markets and sells its software are vastly different from traditional business-to-consumer (B2C) and business-to-business (B2B) marketing channels. At a high level, governmental agencies procure goods and services by awarding government contracts to suppliers. Typically, a government agency develops a procurement plan for goods or services to meet a specific need and invites prospective suppliers to submit bids. Prospective suppliers offer their goods and/or services by submitting a bid, and the agency evaluates all bids based on specified criteria. Following a more detailed evaluation and contract negotiation process, the agency may ultimate "purchase" the goods or services by awarding a government contract to the most suitable supplier. This procurement process requires governmental customers to adhere to strict budgets and to conduct significantly more diligence than private customers seeking goods and services through standard B2C or B2B channels.

14. In or around late 2025, Intterra began to offer its new mobile application to government public service agencies — many of which are existing customers of Intterra's software — via the same B2G channels through which Intterra offers its First Responder App and Community App. Because the mobile application sources data and information from, and serves as a channel of communication for, governmental agencies throughout any given state, Intterra markets and supplies (and intends to market and supply) its mobile application to its governmental customers under the mark AWARE, and an AWARE-formative mark customized for each state comprised of AWARE plus a state-postal-code suffix, such as AWARECA for California agencies, AWAREHI for Hawaii, and AWAREFL for Florida.

15. On December 20, 2025, Intterra filed fourteen new trademark applications for a number of its AWARE-formative marks, including Application Serial No. 99572641 for the word mark AWARECA (the "Application"), for "Downloadable computer application software for mobile phones, and handheld and tablet computers, namely, software for use in the communication

of public safety information; Downloadable computer software for sharing and viewing information about natural disasters, public safety events and emergencies, and preparedness therefor and responses thereto; Downloadable computer software for collecting, compiling, processing, and disseminating information about natural disasters, public safety events and emergencies, and preparedness therefor and responses thereto" in Class 9. Attached hereto as **Exhibit B** are materials downloaded from the U.S. Patent and Trademark Office's Trademark Status & Document Retrieval online database showing the current status of the Application.

16. On January 6, 2026, Intterra announced that the California Department of Forestry & Fire Protection (commonly known as "CAL FIRE") had selected Intterra's mobile application to be California's statewide public safety information platform. As CAL FIRE services the state of California, the mobile application will be made available to end users under Intterra's AWARECA mark. Attached hereto as **Exhibit C** is a true and correct copy of a press release for this announcement published on EIN Presswire. The Director & Fire Chief of CAL FIRE, Chief Joe Tyler, stated in the press release, "By partnering with Intterra on AwareCA, we are ensuring that the public receives accurate, real-time updates directly from CAL FIRE and our allied responders." This statement reflects the fact that even though Intterra developed the mobile application, it is the governmental public safety agencies, ultimately, who will provide the application to end users. Members of the public and other agencies have also expressed excitement for the launch of the mobile application under the AWARE Marks.[2]

17. Intterra's AWARECA application is now in full beta.

18. Intterra has over 350 existing government agencies leveraging its legacy software platform that is being marketed and rebranded as AWARE INTEL HUB.

19. Intterra has an extensive sales funnel with government customers in various stages of the procurement process for its AWARE-branded software goods and services.

---

[2] *See* website screenshots of third-party references to Intterra's mobile application under the AWARE Marks, attached hereto at **Exhibit D**.

20. Numerous agencies have begun using Intterra's AWARE INTEL HUB software platform, which platform unifies agencies' real-time data into actionable intelligence or faster, smarter decisions.

21. In its marketing of the AWARE software services to government agencies, and in the process of procurement, Intterra has also referenced its AWARE OPS mobile application, described as a secure application for use by first responders with authenticated login and two-way communications.

22. Intterra has also continued to offer the AWARECA mobile application for sale to regional public safety agencies (*i.e.*, by submitting bids for government contract awards, all of which are at various stages of the procurement evaluation process). By the end of 2026, Intterra expects that regional public safety agencies serving the majority of the California state population will have awarded Intterra a contract for the AWARECA mobile application, and thus users of the app throughout the majority of the state will be able to receive real-time information, collected from multiple authoritative governmental sources and synthesized for easy consumption, regarding all types of public safety incidents.

**B.    Defendants' Cease and Desist Letter.**

23. On January 28, 2026 — less than a month after the announcement that CAL FIRE was partnering with Intterra on the AWARECA mobile application — Intterra received a demand letter from counsel on behalf of Rachael Brady. The letter alleges that Rachael Brady is "the registered owner of the federally recognized trademark 'Wildfire Aware,'[3] used in connection with a mobile application providing wildfire information and alerts." In the letter, Ms. Brady also claims that Intterra is using AWARE, AWARECA, and AWARE CALIFORNIA in connection with a product that provides "functionally identical services," namely, delivering wildfire and safety alerts to the public in real time through mobile technology. The letter also includes a demand that Intterra (1) cease use of the complained-of marks, any confusingly similar marks, and any products or services using the complained-of marks; and (2) abandon the Application and any other

---

[3] The record owner of U.S. Registration No. 7403027 for the mark WILDFIRE AWARE is The Analytical Moose, not Ms. Brady.

7

COMPLAINT FOR DECLARATORY JUDGMENT

trademark applications for AWARE or AWARE-formative marks. A copy of the January 28 letter is attached hereto as **Exhibit E**.

24. The letter also referenced past interaction between the Parties.

**C.  Past Interactions Between the Parties.**

25. As set forth above (see ¶ 12), Intterra sought to develop a mobile application add-on to its Community App software platform in 2024. Though Intterra had the technical resources to build the application from scratch, Intterra desired to hire an individual into a product management role to lead the team of developers and designers for its new iOS and Android applications. One of Intterra's co-founders suggested Ms. Brady as a potential candidate for the role, as Ms. Brady had experience in the fire service industry and direct connections to the agencies the app would serve.

26. Intterra learned that Ms. Brady had developed her own mobile application and was providing it under the WILDFIRE AWARE mark. Intterra viewed this endeavor as a sign of Ms. Brady's grit and determination, as well as a check in the box for relevant experience and familiarity with building mobile applications. That said, after reviewing Ms. Brady's app, Intterra determined that it was not interested in building its new mobile application on top of her existing software, nor using her software in any manner. Nonetheless, Intterra recognized and deeply respected the significant effort and resources Ms. Brady had put into building the app. Had she chosen to accept Intterra's offer of employment, Intterra wished for Ms. Brady to dedicate this same level of attention and effort to the product manager role and building their new application.

27. Believing Ms. Brady was a good fit for the role, Intterra offered her the product manager position for their new mobile application. Intterra was cognizant that Ms. Brady and others had made significant financial and personal investments in developing the WILDFIRE AWARE app and brand, and also that Ms. Brady, in dedicating her full professional attention to the product management role going forward, would no longer be able to develop or maintain her WILDFIRE AWARE application. Thus, as a show of good faith and as an inducement to accept its job offer, Intterra structured the offer to include a bonus, to be paid over a three-year period, in purported exchange for the WILDFIRE AWARE app and brand. The contemplated bonus, which

was intended to compensate Ms. Brady for the investments she and others had made in the app and the brand, was expressly conditioned upon Ms. Brady's continued employment over the three-year payment period.

28.     Ms. Brady initially declined Intterra's offer for employment in November 2024. After several follow-up conversations, including a subsequent verbal offer of employment, Ms. Brady on March 3, 2025 ultimately declined the role of product manager.

29.     In all of its interactions with Ms. Brady, Intterra's goal was to secure Ms. Brady's employment, not to acquire any rights associated with the WILDFIRE AWARE application and its relatively limited audience.

**D.      Attempted Resolution of the Instant Dispute.**

30.     Following Intterra's receipt of Defendants' January 28 letter, Intterra, via counsel, conducted a preliminary investigation into Ms. Brady's claims. This investigation revealed that the mobile application Defendants provide under the WILDFIRE AWARE mark offers data and information related to wildfires exclusively, not any other public safety threats, and does not relay communications from any governmental authorities other than the National Weather Service. In fact, Defendants' application states that it is positioned to "fill th[e] gap between when the fire starts and when official government evacuation notifications are sent." Moreover, though the app can be downloaded for free, a subscription is required for a user to receive notifications, as seen below:

*Screenshots from Wildfire Aware iOS application*

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

 

*Screenshots from Wildfire Aware iOS application*

31. Through their investigation, Intterra learned that The Analytical Moose, not Ms. Brady, owns U.S. Reg. No. 7403027 for WILDFIRE AWARE.[4] Intterra also discovered that the examining attorney for the WILDFIRE AWARE application had provisionally refused registration due to a likelihood of confusion with a third-party mark, AWARE, subject of U.S. Reg. No. 3099983, for "situation awareness system, namely computer hardware, software and sensors, used to provide real-time or near-real-time GIS information regarding emergency incidents or aerial

---

[4] Public business records for The Analytical Moose show that Ms. Brady is the manager/member and resides at the same address. The Analytical Moose's website also states that it was founded by Ms. Brady and indicates Ms. Brady is the only employee. A true and correct copy of the 2025 Statement of Information filed by The Analytical Moose with the California Secretary of State and the About Us page on The Analytical Moose Website are attached hereto at **Exhibit F**. Based on the foregoing, and Defendants' counsel's claim that Ms. Brady own the mark WILDFIRE AWARE, Intterra believes that Ms. Brady is the sole member and owner of The Analytical Moose.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

mapping projects" in Class 9 and "Preparation of printed or digital maps and emergency incident reports[5] through real-time or near-real-time information gathering" in Class 42.

32. Notably, in Defendants' September 20, 2023 response to the provisional likelihood-of-confusion refusal, Defendants argued (for ten pages) that there was no likelihood of confusion between WILDFIRE AWARE and AWARE for the respective goods and services.[6] Rather, Defendants contended that the WILDFIRE AWARE and AWARE look different, create very different connotations, and impart different commercial impressions, partially because the word WILDFIRE is "the most important part" of Defendants' mark. Defendants also asserted that their goods were not related to the goods and services covered by the cited registration, pointing to the "entirely different targeted audience[s]" and the differing channels of trade for the respective goods and services.

33. Defendants, in their efforts to secure registration of their alleged WILDFIRE AWARE mark, further claimed that there exists a crowded field for the AWARE designation, such that "aware" is entitled only to a narrow scope of protection, one that does not extend to Defendants' WILDFIRE AWARE mark. In support of their crowded field argument, Defendants included evidence of ten third-party registrations coexisting on the Principal Register for AWARE and AWARE-formative marks for similar Class 9 goods. All ten registrations, as well as the registration referenced by the examining attorney in the office action, are still subsisting.

34. Following its investigation into the allegations raised in Defendants' January 28, 2026 letter, Intterra's counsel arranged a video call with Defendants' current counsel to discuss the matter. That call was held on February 6, 2026.

35. On the call, Intterra's counsel stated Intterra believed there is no likelihood of confusion. Defendants' counsel maintained otherwise, despite Defendants' prior position to the contrary with respect to other AWARE and AWARE-formative marks. Intterra expressed interest in settling the matter, regardless of the parties' opposing views on the issue of confusion, and Defendants' counsel requested that Intterra prepare an offer in writing. Following the call, Intterra

---

[5] As of January 21, 2026, "and emergency incident reports" has been deleted from Class 42 of the cited registration.
[6] A copy of this response is attached hereto as **Exhibit G**.

sent a follow-up email, dated February 13, 2026, reiterating its position, referencing the prosecution history of the WILDFIRE AWARE registration, and advising that Intterra considered the matter closed.

36. Defendants responded several days later, reasserting their claims of infringement and likelihood of confusion, and asserting new claims of malicious intent and bad faith based on Intterra's past interactions with Ms. Brady, which Defendants characterized as interest in acquiring the WILDFIRE AWARE application. Defendants also provided formal notice of their intent to bring a claim for trademark infringement in this Court:

> If this matter is not resolved prior to the Spring 2026 launch, our client is prepared to file a complaint in the United States District Court for the Northern District of California asserting claims for trademark infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), unfair competition under applicable state law, and such other claims as the facts may support under federal and state laws.

A true and correct copy of the email correspondence between Intterra's and Defendants' counsel is attached hereto as **Exhibit H**.

### E. An Actual Case or Controversy Exists Between Intterra and Defendants.

37. "To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark." *Halicki Films, LLC v. Sanderson Sales and Marketing*, 547 F.3d 1213, 1225 (9th Cir. 2008); *see* 15 U.S.C. § 1114(1). A party may establish ownership of an unregistered mark through use of the mark in commerce. *Halicki Films*, 547 F.3d at 1226. The Ninth Circuit uses a "totality of the circumstances" test to determine whether a plaintiff has alleged sufficient use in commerce of service mark to establish standing under the Lanham Act. *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001); *see also New West Corp. v. NYM Co. of Calif., Inc.*, 595 F.2d 1194, 1120 (9th Cir. 1979); *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999). "For both goods and services, the 'use in commerce' requirement includes (1) an element of actual use, and (2) an element of display." *Chance*, 242 F.3d at 1159.

38. Intterra is the owner of all right tile and interest in its AWARE Marks, by virtue of its pre-launch marketing of its impending AWARECA application under the AWARE Marks as well as its use of the AWARE Marks in connection with procurement of government contracts with California public service agencies for the AWARE software services.

39. More specifically, Intterra owns all right, title and interest to its AWARECA mark for a downloadable mobile application for use in communication of public safety information and all underlying and associated services. As further described above, marketing is accomplished quite differently in B2G trade channels, as compared to traditional B2C and B2B channels of trade. Use of a mark in submitting a bid for a government contract for procurement of a good or service is an effective — and potentially the only — way to display the mark in connection with an offer for sale of the good or service in the B2G trade channel. Being awarded a government contract based on such a bid constitutes a sale of goods and services provided under the mark, in this case, software goods and services for communication of information regarding public safety incidents and events. Accordingly, Intterra, through its submissions of bids for government contracts and the award of at least one government contract (with CAL FIRE), has demonstrated use of the mark consistent with standard marketing and advertising practices in the field of software goods and services for governmental agencies.

40. With respect to the element of display, Intterra publicly announced the upcoming launch of its mobile application, under the AWARECA mark, for enabling governmental agencies to disseminate official communications regarding public safety incidents and threats based on authoritative governmental data and information. The AWARE Marks are prominently featured throughout Intterra's January 6, 2026 announcement,[7] including in a mockup of the application loading screen:

---

[7] *See* **Exhibit C**, attached hereto

COMPLAINT FOR DECLARATORY JUDGMENT



*Screenshot of mockup of Intterra's mobile application*

41. Accordingly, Intterra has engaged in use of the AWARECA mark sufficient to establish standing to sue under the Lanham Act. Therefore, Intterra has standing to bring this Complaint for a declaratory judgment of noninfringement under the Lanham Act.

42. Additionally, an actual controversy exists between the parties. Defendants have expressly threatened to file suit against Intterra for infringement of their WILDFIRE AWARE mark. The threat of litigation casts a cloud over all the efforts Intterra has made to develop and bring its software to consumers as a governmental, taxpayer-funded service. As Intterra is rapidly nearing the launch of its AWARECA mobile application, rebranding is virtually impossible without delay. The specter of such delay cast by Defendants' threatened litigation places in jeopardy millions of dollars worth of government contracts for the mobile application that have already been awarded to Plaintiff or are in the process of procurement. The potential harm to Intterra is concrete and would be immediate if the Court does not grant the requested declaratory judgment.

**GENERAL ALLEGATIONS**

43. Intterra's AWARE Marks do not infringe on Defendants' WILDFIRE AWARE mark because there is no likelihood of confusion between the parties' respective marks. The element AWARE has become a relatively weak source indicator for the pertinent goods and services, such that the scope of protection for such designation is quite limited. The differences between the parties' respective marks – including the dominance of the primary WILDFIRE element in Defendants' mark – therefore suffice to mitigate any perceived risk of confusion.

44. The parties' respective marks also look and sound different and offer different commercial impressions, and despite being offered in the same general field and ultimately serving overlapping sets of end users, the goods and services provided under the marks have different primary purposes. Defendants' mobile application focuses exclusively on alerts and information relating to wildfires, and targets consumers living in areas prone to wildfires, while Intterra's software is a comprehensive platform for supporting various disciplines of emergency response efforts, for all types of hazards. Most notably, though, the parties' goods and services target different classes of consumers, and travel in different channels of trade. Defendant offers its mobile application for free download, but sells in-app subscriptions to individual users of its mobile application. On the other hand, Intterra markets and sells its software under the AWARE Marks primarily in in B2G channels of trade, and seeks payment for its mobile application under government contracts. This allows Intterra's agency customers to provide the application to end users as a public service, funded by their tax dollars.

45. Additionally, upon information and belief, the sole revenue that Defendants derive from their B2C mobile application are via in-app subscriptions. Intterra's AWARECA application will always be entirely free to the public. The source of the revenue that Intterra derives and will derive from its AWARE-branded services are public sector stakeholders – such as fire departments, law enforcement agencies, and emergency management teams – and such revenue flows and will flow solely through B2G channels. General consumers will encounter Intterra's AWARECA mark only in connection with a government-provided service offered by first-

response agencies, and always under the official names or seals of such agencies. Accordingly, there is unlikely to be any opportunity for confusion, much less a likelihood thereof.

46. Despite the foregoing, Defendants have expressed a genuine intent to file suit for trademark infringement (as further detailed in Paragraph 36 above). Such a lawsuit has potential to significantly hinder Intterra's efforts in fulfilling its obligations under government contracts and in winning further bids to provide its mobile application to additional agency customers. Therefore, this dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

## CLAIMS FOR RELIEF

## COUNT I:

**Declaratory Judgment of Noninfringement of Defendant's WILDFIRE AWARE Mark**

47. Intterra repeats and realleges each and every allegation above as if fully set forth herein.

48. Intterra is entitled to a declaratory judgment that it is not infringing, has not infringed, and is not liable for infringing Defendants' alleged rights in the WILDFIRE AWARE mark.

49. The instant dispute is sufficiently concrete and immediate to warrant the issuance of a declaratory judgment.

50. Defendants allege that Intterra's use of its AWARECA mark infringes its alleged rights in the WILDFIRE AWARE mark.

51. There is no likelihood of confusion with respect to the parties respective marks. The marks look and sound different and convey different commercial impressions, and the goods and services provided under the marks have different purposes, target different classes of consumers, and travel in different channels of trade. Moreover, because of the high level of sophistication of Intterra's government agency customers and unique process through which Intterra sells its software, there is unlikely to be any opportunity for confusion, much less a likelihood thereof. In the exceedingly rare instances where consumer may encounter both of the Parties' respective marks in commerce, Intterra's AWARECA mark will appear alongside the

name(s) and/or mark(s) of one or more public safety agencies and Intterra's application will be presented as an official government-provided service.

52. In light of the foregoing, among other factors, consumers are unlikely to mistakenly believe that there is any connection or affiliation between the parties, or that either party's application is sponsored, produced, or associated with the other party or its application.

53. Because Defendants have threatened action in this Court to prevent Intterra from continuing to use its AWARECA mark, which is likely to hinder Intterra's abilities to fulfill obligations under existing government contracts, and because a declaration by this Court that Intterra's use of the AWARECA mark does not infringe Defendants' alleged rights in the WILDFIRE AWARE mark will allow Intterra to continue providing its mobile application to public safety agencies for dissemination to private citizen end users under the AWARECA mark, without disruption and fear of litigation, Intterra is entitled to a declaratory judgment of noninfringement of Defendants' WILDFIRE AWARE mark.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Intterra respectfully requests judgment against Defendant The Analytical Moose and Rachael Brady as follows:

a. Find and declare that Intterra's use of its AWARECA mark does not infringe any of Defendants' alleged trademark rights in WILDFIRE AWARE;

b. Enter an order enjoining Defendants from directly or indirectly asserting or otherwise enforcing any alleged trademark rights against Intterra or any of its customers or licensees of its AWARECA mark;

c. Award Intterra reasonable attorneys' fees, expenses, and costs in this action; and

d. Granting such other and further relief as the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

Intterra demands a trial by jury on all issues so triable in this action.

| | |
|---|---|
| Dated: March 5, 2026 | **HOLLAND & KNIGHT LLP** |
| | By:       /s/ Daniel P. Kappes       |
| | Robert S. Hill (CA Bar No. 276056) |
| | Robert.Hill@hklaw.com |
| | Daniel P. Kappes (CA Bar No. 303454) |
| | Daniel.Kappes@hklaw.com |
| | Daniel C. Neustadt (NY Bar No. 4532958) |
| | *(pro hac vice pending)* |
| | Dan.Neustadt@hklaw.com |
| | Lauren Caverly Pratt (TN Bar No. 040362) |
| | *(pro hac vice pending)* |
| | Lauren.Caverly@hklaw.com |
| | **HOLLAND & KNIGHT LLP** |
| | 800 17th Street N.W., Suite 1100 |
| | Washington, D.C. 20006 |
| | Telephone:  (202) 955.3000 |
| | *Attorneys for Plaintiff Intterra, LLC* |

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

19

COMPLAINT FOR DECLARATORY JUDGMENT